[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 31, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-10183

_____

D. C. Docket No. 06-00009-CR-WS

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

BRUCE CLAYTON PUGH,
a.k.a. sknowgirl,
a.k.a. alabamaprincess4,
a.k.a. pgugh,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(January 31, 2008)**

Before MARCUS and PRYOR, Circuit Judges, and HANCOCK[*], District Judge.

_____

[*] Honorable James Hughes Hancock, United States District Judge for the Northern District of Alabama, sitting by designation.

MARCUS, Circuit Judge:

This appeal tests the nature and extent of appellate review over sentencing under the new regime of advisory Sentencing Guidelines. After thorough review, we are constrained to conclude that even under the most recent Supreme Court precedent, affording substantial deference to the district court's sentencing determinations, the district court abused its discretion by imposing a probationary sentence on the defendant in this case.

Here, the government appealed from the non-custodial sentence of defendant Bruce Clayton Pugh ("Pugh"), who downloaded on his computer over a period of several years at least 68 images of child pornography, as well as videos of an adult male raping an infant girl and of a young girl performing oral sex on an adult male. The advisory Sentencing Guidelines range recommended for the offense to which Pugh pled guilty -- knowing possession of images of child pornography that were mailed, shipped or transported by computer in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2256(8)(A) -- was 97 to 120 months' imprisonment. The district court nevertheless sentenced Pugh to a five-year probationary term. In so doing, the district court relied heavily on Pugh's history, characteristics and motive in imposing a non-custodial sentence for a crime that fell on the high end of the Guidelines sentencing table. But in our view, the district court did not provide a

2

sufficiently compelling justification to support the degree of its variance, nor did it give any apparent weight to many other important statutory factors embodied by Congress in 18 U.S.C. § 3553(a) that must be considered at sentencing. As we see it, this probationary sentence utterly failed to adequately promote general deterrence, reflect the seriousness of Pugh's offense, show respect for the law, or address in any way the relevant Guidelines policy statements and directives. Accordingly, we hold that this sentence is unreasonable, and therefore vacate and remand so that the district court can re-calculate the defendant's sentence.

I.

The presentence report ("PSI") presented the following basic facts. During an investigation conducted in Oklahoma in May 2003, the FBI learned that Warren Paul Perkins, III, had emailed child pornography images to the America OnLine ("AOL") screen name "moonkiss." The FBI traced that screen name to Joyce Pugh, the defendant's sister and housemate, and obtained a warrant to search the computer systems and other related computer components owned by the Pughs. During a search of the Pugh home in Selma, Alabama in September 2003, a police detective observed several images of nude pubescent children in provocative poses in Pugh's computer files.

When interviewed on the day of the search by an FBI agent, Pugh said he downloaded child pornography images but then deleted them. Pugh added that he may have forwarded child pornography to the "list me" areas in chat rooms. Pugh told the FBI that he entered chat rooms on the Internet pretending to be an underaged female and that people would then email him child pornography images. He also admitted that he once saw an image on his computer of a man having sex with a two- or three-year old who had a dog collar around her neck.

A subsequent forensic examination of Pugh's computer by the FBI revealed some 70 images of child pornography, including a horrifying video of an infant girl being raped by an adult male, a video of a young girl performing oral sex on an adult male, and an image of male and female children engaged in sex acts with an adult male. There were ten known child victims -- young boys and girls whose identities have been established by the government -- in the images found on the defendant's computer.

The FBI interviewed Pugh again in March 2005. At this time, Pugh told the investigators that he went to the chat rooms pretending to be an underaged girl using the screen name "sknowgirl." Some users would send Pugh child pornography thinking he was a young girl. When erotica pictures came to him from other users, Pugh would separate them, save them, and send them to other

4

users under the pretense that he was the subject of the pictures. According to Pugh, men were always trying to pick him up over the Internet, and he justified his pretense by thinking that he was keeping the men away from "real children."

He said that everyone in the chat rooms sent him child pornography images, even though he asked them for adult pornography. Pugh explained that he actively sought adult "bondage" and "scat" pornography,[1] not the child pornography that others sent him, and that he never looked for child pornography on the Internet. Pugh offered that he did not want the pictures, which did not arouse him; rather, he only wanted to talk. However, he knew that his pretense would in fact cause people to send him child pornography.

In a January 2006 indictment, Pugh was charged by a federal grand jury sitting in the Southern District of Alabama with receipt and distribution of images of child pornography by computer in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1) (count one); possession of images of child pornography that had been mailed, shipped or transported by computer in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2256(8)(A) (count two); and receipt of obscene matter by interactive computer service in violation of 18 U.S.C. § 1462 (count three). In

---

[1] In Pugh's case, the "scat" images on his computer depicted women defecating in each other's mouths.

March 2006, Pugh pled guilty to the possession count embodied in Count Two, pursuant to a written plea agreement.

As part of the plea agreement, Pugh admitted to "knowingly possess[ing] a computer[] and compact disc which contained more than 3 images of child pornography . . ." in violation of 18 U.S.C. § 2252A(a)(5)(B). Pugh further admitted that a forensic examination of his computer revealed that he had approximately 68 images and two videos of child pornography, which had been downloaded from the internet using AOL.

These images included the following:

| | |
|---|---|
| yungcumpusjpg: | a video of a female infant with an adult male penis penetrating the infant's vagina. The adult male has ejaculated and semen is on the surface of the infant's labia. |
| xxxjob.mpeg: | a video of a child approximately 12 years of age performing oral sex on an adult male. |
| (1).jpg: | phot[o] of a boy and girl both of whom are approximately 8 years of age and the girl has the penis of an adult male in her mouth. |

Pugh also admitted to connecting to the internet using AOL, visiting chat rooms pretending to be an underaged child, and viewing the child pornography sent to him by others in the chat rooms.

Using the 2002 Guidelines Manual, as supplemented on April 30, 2003, the probation officer determined Pugh's base offense level to be 17 under U.S.S.G. § 2G2.2. The offense level then was enhanced 2 levels under U.S.S.G. § 2G2.2(b)(1) because the material involved prepubescent minors or minors under age 12; 5 levels under U.S.S.G. § 2G2.2(b)(2)(B) because the offense involved distribution for the receipt of child pornography but not for pecuniary gain; 4 levels under U.S.S.G. § 2G2.2(b)(3) because the material portrayed sadistic or masochistic conduct or other depictions of violence; 2 levels under U.S.S.G. § 2G2.2(b)(5) for use of a computer or interactive computer service; and 3 levels under U.S.S.G. § 2G2.2(b)(6) for more than 150 but fewer than 300 images.[2]  Subtracting 3 levels for acceptance of responsibility under U.S.S.G. § 3E1.1, Pugh's adjusted offense level was 30, and his criminal history category was level I.  Thus, the advisory Sentencing Guidelines yielded a range of 97-120 months' imprisonment.

At the sentencing hearing, the district court adopted the PSI as published. Pugh's counsel then called John Frank Warren, III, Ph.D., ("Warren") to testify concerning Pugh's mental state and likelihood of recidivism.  Warren, a clinical

---

[2] Pugh admitted possessing 68 still images plus 2 video clips, each of which counted as 75 images under clarifying amendment 664 of the 2004 Guidelines Manual (providing that "[e]ach video, video-clip, movie or similar recording shall be considered to have 75 images"), and U.S.S.G. § 1B1.11(b)(2) (directing that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced").

and forensic psychologist, testified that in his opinion, Pugh presented a "low-risk" on a "low-moderate-high" risk assessment scale, which measures an offender's risk of re-offending, but recognized that "no one is a no risk." Warren also opined that Pugh was not a pedophile, and was not addicted to child pornography, but rather, was addicted to adult pornography, an addiction that developed as a result of an abusive home life. Warren observed that in the late 1990s, Pugh had sought mental health treatment for his pornography addiction, but none of the therapists or the psychiatrist he met with addressed his concerns, and eventually, he stopped going.

Warren further suggested that Pugh would be "easy pickings for more predatory or sociopathic peers" in a prison setting and that a prison sentence could lead Pugh to "more maladaptive coping and, arguably, a higher risk status following additional victimization." According to Warren, Pugh is receiving treatment from a psychologist in Selma, Alabama.

Warren acknowledged that he had viewed a video from Pugh's computer in which an adult male raped an infant female, and admitted that this experience would have a "horrible impact" on the child victim. Warren also explained that the impact on the children depicted in the other pornographic images on Pugh's computer was "very detrimental," and offered, "that's the reason we have laws about child pornography." Finally, when questioned by the district court, Warren

8

testified he had not diagnosed most defendants in the prior child pornography cases he worked on as pedophiles -- in fact, he had diagnosed only two of about 45 or 50 as pedophiles -- which he said was consistent with the literature. Warren added that in contrast to Pugh, however, most defendants in child pornography cases are diagnosed as having Internet child pornography paraphilia.

Pugh then addressed the district court about the charges.[3] Following counsel's arguments, the district court concluded that it needed additional information before sentencing Pugh, and set a second sentencing hearing to take further testimony on these issues. In December 2006, at Pugh's second sentencing hearing, FBI Special Agents Fred Haynes ("Haynes") and George Glaser

---

[3] The PSI also referenced an incident in November 2004 involving Pugh's great-niece. The FBI was contacted by Patricia Smith ("Smith"), another sister of Pugh's, who told them that she had been driving home from church with one of her daughters and her granddaughter. While in the car, her granddaughter had told her, "Mee Maw, know what? Uncle Bruce told me that he licked the hair off a girl." Ms. Smith asked the girl to repeat herself, and she said, "Uncle Bruce said he licked the hair off a girl's crotch, and she licked his off."

Warren testified that he was skeptical of the story involving Pugh's great-niece. He said that in his experience working with and evaluating children of abuse, children "misinterpret a lot of things" and "incorporate something they've seen in a movie versus something they saw mommy do versus something they heard about at school. It comes out as a narrative that very often doesn't match what actually occurs." Warren concluded, "I discounted [this information] and found it relatively fantastic." Pugh also testified about his interpretation of what happened with his great-niece, which was consistent with the earlier statements of Warren and defense counsel. Pugh's mother and his sisters Joyce and Brenda also testified on Pugh's behalf; his mother and Joyce discounted the allegation regarding Pugh's great-niece.

After two sentencing hearings in which the district court took testimony on this issue, ultimately no factual findings were made regarding whether or how the incident occurred.

("Glaser") testified concerning their interviews with Pugh. Haynes specifically testified that during the first interview he conducted with the defendant in 2003, Pugh said that he had downloaded child pornography and that there were possibly hundreds of images on his computer. Pugh said that he did not actively seek the child pornography and never searched for it on the Internet but that he had seen it. He explained that it was sent to him while he was pretending to be an underaged person in chat rooms, which he claimed he did because "he felt like . . . [by doing so] he was keeping the child predators away from the children." Notably, Pugh "admit[ted]" to Haynes "that he had forwarded child pornography to others on his list in the chat rooms." During a second interview in 2005, Haynes and Glaser showed Pugh images retrieved from his computer. Pugh said that when he first started receiving child pornography images, he reported the senders to AOL. Haynes and Glaser asked Pugh why he did not stop soliciting the child pornography and Pugh responded that he was "addicted to it."[4]

---

[4] The record is confusing as to what Pugh exactly admitted to being addicted to during the FBI interviews -- whether it was child pornography or internet conversations. Specifically, Special Agent Haynes testified that Pugh admitted in his second interview that "he was addicted to the conversations." Haynes later testified that when he asked Pugh why he didn't just stop eliciting the child pornography, Pugh responded "that he was addicted to it," and on cross-examination, Haynes answered yes when asked if "[Haynes] said that [Pugh] said that [Pugh] was addicted to child porn," and when asked if "[Pugh] told [Haynes] [Pugh] was addicted to the conversations he was having in the chat rooms." Pugh testified that he knew they were talking about child pornography at the second interview (when the alleged addiction comment was made), but explained, "I was nervous. I wish I hadn't said some of the things I had."

Haynes further testified that during the interviews, Pugh understood the difference between child pornography and adult pornography. On cross-examination, when asked if Pugh might have said that he was addicted to the chat room conversations that resulted in him receiving child pornography, as opposed to being addicted to the child pornography, Haynes would not concede that he and Pugh had misunderstood each other.

Glaser testified that as a certified "Computer Analysis and Response Team" or "CART" examiner, he had examined Pugh's computers. Glaser found images of obscene adult pornography and of child pornography on the machines. Glaser confirmed that there were 10 known victims -- children whose identities have been established by the government -- in the child pornography found on Pugh's computer. Glaser had no prior experience with a defendant like Pugh, who entered chat rooms disguised as a child to obtain adult pornography. Glaser said there were 118,000 images on Pugh's computers, but most of those images were not pornographic. Of the 118,000 images, Glaser estimated that more than 1000 of the images were pornographic. Of those 1000-plus images, Glaser said that approximately 60 images were child pornography.

Pugh then testified. As for his first interview with Haynes, Pugh said that he did not know at the beginning of the questioning that the FBI agents were talking

11

about child as opposed to adult pornography. When asked why he did not clarify his statements after he learned that Haynes had been talking about child pornography, Pugh said: "I was too scared to say anything because I've seen movies, court shows where you say that you want to change your statement, they could use that against you, saying, oh, he's changing his story, you know." Regarding his habit of entering chat rooms disguised as a girl, Pugh explained that he was looking for conversation:

> When I first got AOL, I had tried to be myself, and people would not talk to me. And a friend of mine at the time had instant-messaged me with a female name, and he said, hey Bruce, it's me, Mark. And that's what gave me the idea of pretending to be a girl. And I'd go into a chat room, and you could type in 14, female, you know, describe what your age and sex is, and I would get instant messages galore. And I was like, oh, this is the way to go. But I was looking for chat. I never pushed it towards sexual chat. It was the males that I talked to that would push it towards sexual chat. I know it was wrong, but I would go along with it because I did enjoy talking to people.

Following counsel's arguments, the district court adopted the findings and the calculations embodied in the PSI yielding an adjusted offense level of 30 and a criminal history category I, with a resulting advisory sentencing range of 97 to 120 months. Noting the seriousness of Pugh's crime and Congress's harsh treatment of it, the district court then explained its decision to impose a completely non-custodial sentence.

The district court explained that Pugh had no significant criminal history, and no history that would suggest he had or would abuse children. The court determined that Pugh's possession of child pornography was "passive" and "incidental" to his actual goal of developing online relationships, even though Pugh pretended to be an underaged female in these online chats and occasionally sent child pornography to others.[5] The court observed that Pugh took steps to minimize the receipt of child pornography by reporting it and talking about it with his mother, and the court noted that he had voluntarily entered treatment for addiction to adult pornography.

The district court then cited to Warren's opinion that Pugh was not a pedophile and presented a low risk of re-offending, that Pugh would not benefit from a custodial sentence, and that Pugh was addicted to adult, but not child pornography. The court also noted that Pugh had not re-offended since his arrest and had been compliant with the court's pre-sentencing orders. The court contrasted Pugh's case with other defendants who pay for or actively solicit child

---

[5] The district court actually said that Pugh "produced" child pornography, but because there is no evidence of production in the record, we assume the district court meant "distribution" rather than production. The evidence concerning distribution, as we have already noted, includes Special Agent Haynes's testimony that Pugh "admit[ted] to [him] that he had forwarded child pornography to others on his list in the chat rooms."

pornography, and concluded that an "unusual sentence for an unusual case" was necessary, and that it was "convinced" that it would "never" see Pugh again.

The district court proceeded to sentence Pugh to a five-year probationary term on the conditions that Pugh (1) continue his mental health treatment; (2) not possess a computer with internet access; (3) consent to periodic, unannounced examinations of any computer equipment he possessed; (4) submit to searches based on reasonable suspicion; and (5) register with the state sex-offender registry.

After the district court denied the United States's motion to reconsider the sentence and impose either a sentence within the Guidelines, or a sentence of at least one day in prison followed by a life term of supervised release, the United States timely appealed the sentence arguing that it was so disproportionately light in view of the seriousness of the offense that it amounted to an abuse of discretion, and was, therefore, unreasonable.

## II.

Because the law of sentencing has been changing rapidly, we begin by providing some analysis of its current state. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the mandatory Guidelines system codified in the Sentence Reform Act of 1984, 18 U.S.C. § 3551 et seq., 28 U.S.C. §§ 991-998 ("SRA") -- which had been enacted to reduce the unwarranted disparities that

had plagued the previous discretionary sentencing regime, id. at 250, 252, 253, 255, 256, 264, 267 -- violated the Sixth Amendment. Id. at 232-35. In its place, the Court identified two features of the SRA that would remain and work together "to move sentencing in Congress' preferred direction." Id. at 264. The first was a continued important role for the Sentencing Guidelines. See id. at 264-65. Specifically, the Court held that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 264.

The second was the continuation of appellate review. While Booker held that sentences could no longer be reviewed de novo, it determined that appellate courts thereafter would apply a "reasonableness" standard of review. According to Justice Stevens, the Court "expressly equated" reasonableness review "with the old abuse-of-discretion standard used to review sentencing departures." Rita v. United States, 127 S. Ct. 2456, 2471 n.2 (2007) (Stevens, J., joined by Ginsburg, J., concurring). As the Court explained in Booker, "reasonableness" standards are "not foreign to sentencing law." 543 U.S. at 262. "The Act has long required their use in important sentencing circumstances -- both on review of departures, see 18 U.S.C. § 3742(e)(3) (1994 ed.), and on review of sentences imposed where there was no applicable Guideline, see §§ 3742(a)(4), (b)(4), (e)(4)." Id. (citing United

15

States v. White Face, 383 F.3d 733, 737-40 (8th Cir. 2004); United States v. Tsosie, 376 F.3d 1210, 1218-19 (10th Cir. 2004); United States v. Salinas, 365 F.3d 582, 588-90 (7th Cir. 2004); United States v. Cook, 291 F.3d 1297, 1300-02 (11th Cir. 2002); United States v. Olabanji, 268 F.3d 636, 637-39 (9th Cir. 2001); United States v. Ramirez-Rivera, 241 F.3d 37, 40-41 (1st Cir. 2001)); see also United States v. Winingear, 422 F.3d 1241, 1246 (11th Cir. 2005) (per curiam) ("Before Booker, we reviewed departures from the Guidelines for reasonableness."). Booker recognized that reasonableness review could not "provide the uniformity that Congress originally sought" when it enacted the SRA and its original scheme of mandatory Guidelines. 543 U.S. at 263. Nevertheless, reasonableness review would still "tend to iron out sentencing differences." Id.

Booker further held that in performing this review, we must measure "reasonableness" against the factors outlined by Congress in 18 U.S.C. § 3553(a).[6]

_____

[6] Section 3553(a) provides the following considerations for the court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and

Booker, 543 U.S. at 261.  The Supreme Court explained that the factors contained in Section 3553(a) would not only "guide" the district courts in sentencing, but that "[t]hose factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  Id.; accord Winingear, 422 F.3d at 1246; see also  United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam) ("We must evaluate whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in section 3553(a).").  We have also held that the burden of establishing that a sentence is unreasonable lies with the party challenging the sentence.  Talley, 431 F.3d at 788.

---

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[;]
>
> (5) any pertinent policy statement[;]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The next opportunity the Supreme Court had to address the new sentencing regime came in Rita v. United States, 127 S. Ct. 2456 (2007), where the Court concluded that appellate courts could properly presume that a sentence imposed within a properly calculated Sentencing Guidelines range was reasonable. In reaching this conclusion, the Court unambiguously said that appellate courts must apply "reasonableness" review to a district court's sentence, which "merely asks whether the trial court abused its discretion." 127 S. Ct. at 2465. Rita also explained that "[w]here the judge imposes a sentence outside the Guidelines, the judge will explain why he has done so." 127 S. Ct. at 2468.

The Supreme Court most recently addressed sentencing in Gall v. United States, 128 S. Ct. 586 (2007), and Kimbrough v. United States, 128 S. Ct. 558 (2007).[7] Gall reviewed the reasonableness of a sentence falling far below the range recommended by the Guidelines (a probationary term instead of a sentence falling within the Guidelines range of 30-36 months' imprisonment), and specifically addressed "whether a court of appeals may apply a 'proportionality test,' and require that a sentence that constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances." 128 S. Ct. at 591. The Court determined that "while the extent of the difference between a particular sentence

_____

[7] Kimbrough primarily involved issues related to the Guidelines for crack cocaine offenses.

18

and the recommended Guidelines range is surely relevant, courts of appeals must review all sentences -- whether inside, just outside, or significantly outside the Guidelines range -- under a deferential abuse-of-discretion standard." Id.

In its analysis, Gall reiterated that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Id. at 596. Gall further emphasized that "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Id.

Gall also repeated that appellate review of sentencing decisions employs the "familiar abuse-of-discretion standard of review," id. at 594, and then created a two-step process for conducting that review: first, the appellate court "must . . . ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range." Gall, 128 S. Ct. at 597. The first step -- aimed at addressing "procedural" errors -- highlights the continued importance of the Guidelines, and the Booker

19

Court's intention that the "continued use of the Guidelines in an advisory fashion would further the purposes of Congress in creating the sentencing system to be honest, fair, and rational." Talley, 431 F.3d at 787. So although the Court "reject[ed] . . . an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range . . . [or] the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence," it nonetheless repeatedly emphasized that "appellate courts may therefore take the degree of variance into account and consider the extent of a deviation from the Guidelines." Gall, 128 S. Ct. at 595.

> Indeed, Gall explained that a district judge
>
> must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.

Id. at 597 (emphases added). Thus, not only must the district courts "consult th[e] Guidelines and take them into account when sentencing," Booker, 543 U.S. at 264, they must properly calculate the Guidelines range and "includ[e] an explanation for any deviation from the Guidelines range." Gall, 128 S. Ct. at 597.

20

After an appellate court has determined that "the district court's sentencing decision is procedurally sound," Gall directs that "the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Id. at 597. The Court explained:

> When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

Id. (citation omitted).

Gall reminds us once again, as Pugh suggests, to appreciate the institutional advantage that district courts have in applying and weighing the Section 3553(a) factors in individual cases. Nonetheless, it also remains true that the district court's choice of sentence is not unfettered. Again, Gall makes clear that the district court is obliged to "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." 128 S. Ct. at 596-97 (emphasis added). The Section 3553(a) "factors in turn . . . guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."

21

Booker, 543 U.S. at 261; accord Winingear, 422 F.3d at 1246; see also Talley, 431

F.3d at 788 ("We must evaluate whether the sentence imposed by the district court

fails to achieve the purposes of sentencing as stated in section 3553(a).").  The

appellate court "will, of course, take into account the totality of the circumstances,

including the extent of any variance from the Guidelines range."  Gall, 128 S. Ct.

at 597.[8]

These directives leave no doubt that an appellate court may still overturn a

substantively unreasonable sentence, albeit only after examining it through the

prism of abuse of discretion, and that appellate review has not been extinguished.

Thus, a sentence still may be substantively unreasonable if it does "not achieve the

purposes of sentencing stated in § 3553(a)." United States v. Martin, 455 F.3d

1227, 1237 (11th Cir. 2006).  So, even though we afford "due deference to the

district court's decision that the § 3553(a) factors, on a whole, justify the extent of

the variance," Gall, 128 S.Ct. at 597, we may find that a district court has abused

its considerable discretion if it has weighed the factors in a manner that

demonstrably yields an unreasonable sentence.  We are therefore still required to

make the calculus ourselves, and are obliged to remand for resentencing "if we are

---

[8] Because we review the "totality of circumstances," a district court need not discuss each
Section 3553(a) factor, Talley, 431 F.3d at 786, although "[w]here the judge imposes a sentence
outside the Guidelines, the judge will explain why he has done so." Rita, 127 S. Ct. at 2468.

22

left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." United States v. McBride, No. 06-16544, 2007 WL 4555205, at *3 (11th Cir. Dec. 28, 2007) (internal quotation marks omitted); United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007); cf. United States v. Fernandez, 443 F.3d 19, 34-35 (2d Cir. 2006) (stating that "we will not second guess the weight (or lack thereof) that the judge accorded to a given factor . . . [under § 3553(a)], as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented" (emphasis added)). This standard of review is altogether consonant with our traditional use of the abuse-of-discretion standard, under which we will reverse only if "we find that the district court has made a clear error of judgment . . . ." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

Moreover, a district court's unjustified reliance on any one Section 3553(a) factor may be a symptom of an unreasonable sentence. See United States v. Crisp, 454 F.3d 1285, 1292 (11th Cir. 2006) (citing United States v. Rattoballi, 452 F.3d 127, 137 (2d Cir. 2006); United States v. Ture, 450 F.3d 352, 358-59 (8th Cir. 2006); United States v. Hampton, 441 F.3d 284, 288-89 (4th Cir. 2006); United States v. Cage, 451 F.3d 585 (10th Cir. 2006)); accord United States v. Ward, 506

23

F.3d 468, 478 (6th Cir. 2007). Likewise, "[a] sentence may be substantively unreasonable when the district court selects the sentence arbitrarily, bases the sentence on impermissible factors [or] fails to consider pertinent section 3553(a) factors." Ward, 506 F.3d at 478 (internal quotation marks omitted); see also United States v. Ausburn, 502 F.3d 313, 328 (3d Cir. 2007) (asking if the district court: "(1) exercised its discretion by giving meaningful consideration to the § 3553(a) factors; and (2) applied those factors reasonably by selecting a sentence grounded on reasons logical and consistent with the factors") (internal quotation marks omitted); United States v. Willingham, 497 F.3d 541, 543-44 (5th Cir. 2007) (asking if sentence: "(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors") (citation omitted); United States v. Boleware, 498 F.3d 859, 861 (8th Cir. 2007) (same).

We hasten to add that while the application of these analyses may suggest an unreasonable sentence, they do not necessarily make a sentence unreasonable: Gall itself found that the district court did not commit reversible error simply because it "attached great weight" to a single factor. 128 S. Ct. at 600; see United States v. Pauley, No. 07-4270, 2007 WL 4555520, at *7 (4th Cir. Dec. 28, 2007). However,

24

it remains uncontroverted that a sentence suffering from these "symptoms" may in fact be unreasonable, depending on an examination of the "totality of the circumstances." Gall, 128 S. Ct. at 597. And a review of the totality of the circumstances in this case through the lens of abuse of discretion yields the conclusion that Pugh's sentence is substantively unreasonable.

III.

The district court found "based on the facts of this case, based on [Pugh's] personal characteristics and history, and based on a consideration of all of the other factors," that Pugh did not deserve a Guidelines range -- much less a custodial -- sentence. In reciting its rationale, the district court focused primarily on one of the many Section 3553(a) factors -- "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). In particular, as we have noted, the district court emphasized that Pugh (1) was a first-time offender without a history suggesting that he had or would abuse children; (2) was addicted to adult pornography and had sought treatment for that addiction; (3) was not a pedophile and presented a low risk for recidivism, according to a psychologist who evaluated him; and (4) complied with the terms and conditions of his pretrial supervision. The district court further found that Pugh's possession offense was "passive" and "incidental" to his actual goal of developing online

25

relationships, and that Pugh had taken steps to report his receipt of child pornography to AOL and his family.

To be sure, we appreciate the thoughtfulness and care taken by the district court in sentencing Pugh -- the court held two sentencing hearings, and deliberated extensively over its sentencing decision in this case. We also recognize the wide discretion afforded to district courts in sentencing, especially since the district court is in a "superior position to find facts and judge their import." Gall, 128 S. Ct. at 597 (internal quotation marks omitted). Accordingly, we accept, as we must, the findings of fact made by the district court in this case; we discern no clear error in this regard.

We do, however, observe these additional salient facts that were elicited, and uncontroverted, at the sentencing hearings: Pugh intentionally posed as a teenage girl and knew that he would receive child pornography through this posture; Pugh derived a benefit from these images, as evidenced by Pugh's admission that "this [wa]s the way to go" for him to achieve his "goal" of communication; Pugh repeatedly downloaded the child pornography images and videos at least 70 times over a period of several years; Pugh forwarded some of these images to others in the chat room; the images were grotesque, and, as noted, included a video of an adult male raping an infant girl and a picture of an adult male having sex with a

26

toddler with a dog collar around her neck; Pugh failed to report these images to the police; and the psychologist admitted that Pugh did not present "no" risk for recidivism. Likewise, we note that the federal penal code treats the possession of child pornography and child abuse as distinct offenses.[9]

Although the district court concluded, on these facts, that Pugh's conduct was "incidental" and "passive," his conduct was neither isolated, unintentional nor lawful. Nevertheless, Pugh argues in his supplemental brief that "the district judge regarded Pugh's passive and incidental, as opposed to willful, possession of the child pornography as a reasonable basis for giving him a less severe sentence than the sentences he has given to more typical child pornography offenders who solicit or purchase child pornography images." App'ee Supp. Br. at 19 (emphasis added). This argument misses the mark. Pugh seems to suggest that because the district court found that his ultimate motive was not to gather child pornography, somehow his crime was not "willful." But on this record there can be no dispute that Pugh downloaded and forwarded child pornography consciously, intentionally, deliberately, and voluntarily, regardless of whether the receipt of child

---

[9] See, e.g., United States v. Goff, 501 F.3d 250, 259 (3d Cir. 2007) (where a defendant was charged with child pornography possession but "was not charged with molestation, . . . pointing out that he hadn't committed it is, in one sense, irrelevant"); United States v. Grosenheider, 200 F.3d 321, 332-34 (5th Cir. 2000) (collecting cases rejecting departures based on rationale that defendant had "not abused any child, and had no inclination, predisposition or tendency to do so").

27

pornography was his end goal or only a means by which to encourage others to "chat" with him. Cf. Georgia Elec. Co. v. Marshall, 595 F.2d 309, 318 (5th Cir. 1979) ("a conscious, intentional, deliberate, voluntary decision, which, regardless of a venial motive, properly is described as willful") (internal quotation marks omitted).[10] Indeed, he pled to "knowingly possess[ing]" 68 images and two videos of child pornography. While motive may be a valid concern at sentencing, it cannot obliterate the knowing, deliberate and repeated means by which this serious crime was committed. See, e.g., United States v. Carlson, 498 F.3d 761, 766-67 (8th Cir. 2007) (concluding that a district court's reliance on a defendant's intentions, which were "arguably better than a defendant who uses the funds for purely personal reasons" but nonetheless resulted in fraud on the government, "not particularly compelling" for a reduced sentence).

With this factual background in mind, we turn to whether (when viewed through the prism of abuse of discretion) the district court's sentence was substantively unreasonable. While undertaking this calculus, we are not limited to considering only the factors expounded upon by the district court; as the Supreme Court has made clear, Section 3553(a) "remains in effect, and sets forth numerous

---

[10] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit that were rendered prior to October 1, 1981.

28

factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." Booker, 543 U.S. at 261. Indeed, we could not begin to review the reasonableness of a sentence without examining all of the relevant factors embodied in Section 3553(a).

Having reviewed all of those factors in the context of this case, we conclude that in imposing a non-custodial sentence, the district court performed a narrow, although intensive, analysis that minimized -- and in some instances, ignored -- many of the important Section 3553(a) concerns that we are directed to consider by Congress and the Supreme Court. Id.; Gall, 128 S. Ct. at 596. As we have already observed, a sentence may be unreasonable if it is grounded solely on one factor, relies on impermissible factors, or ignores relevant factors. See supra at _. At the end of the day, the sentence in this case is unreasonable, and the district court's analysis suffers from many of these "symptoms." We detail them below.

*First*, Pugh's sentence does not "afford adequate deterrence to criminal conduct," i.e., general deterrence. 18 U.S.C. § 3553(a)(2)(B); Martin, 455 F.3d at 1240. This factor -- along with retribution, rehabilitation, and incapacitation -- expressly makes up one of the four purposes of sentencing identified by Congress in Section 3553(a). See S. Rep. No. 98-225, at 75-76 (1983), reprinted in 1984

29

U.S.C.C.A.N. 3182, 3259 ("to deter others from committing the offense" is one of the four purposes of sentencing). Congress intended that courts consider <u>each</u> of these four stated factors "in imposing sentence in a particular case." <u>Id</u>. at 68, 75, 1984 U.S.C.C.A.N. at 3251, 3258; <u>id</u>. at 77, 1984 U.S.C.C.A.N. at 3260 ("The intent of subsection (a)(2) is . . . to require that the judge consider what impact, if any, each particular purpose should have on the sentence in each case."). Indeed, as the Eighth Circuit has observed, "general deterrence . . . is one of the key purposes of sentencing . . . ." <u>United States v. Medearis</u>, 451 F.3d 918, 920-21 (8th Cir. 2006) (quotations omitted).

This is particularly compelling in the child pornography context, as the Seventh Circuit has aptly said:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded -- both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced.

<u>United States v. Goldberg</u>, 491 F.3d 668, 672 (7th Cir.) (citations omitted), <u>cert. denied</u>, 128 S. Ct. 666 (2007); <u>see also</u> <u>Goff</u>, 501 F.3d at 261 ("deterring the production of child pornography and protecting the children who are victimized by

30

it are factors that should have been given significant weight at sentencing, but in fact received not a word from the District Court"). Pugh's probationary sentence, we think, tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market. This problem is compounded not just because of the number of images Pugh downloaded over an extended time frame, but also because Pugh distributed some of the images to others.

Pugh suggests, however, that the district court's observation that it had imposed "harsh but . . . appropriate sentences" in other cases adequately addressed general deterrence and respect for the law (a factor discussed below). Even if this statement could be read as touching, albeit tangentially, on these factors, we still cannot say that the resulting sentence fairly reflects their consideration. Indeed, it is unclear to us how the district court's sentences in other cases can be seen as explaining how a probationary sentence for possession of child pornography in this case promotes general deterrence or, for that matter, respect for the law. This seems to be especially true here where unlike in Gall, no other co-defendants were sentenced for the same crime that Pugh has committed. Quite simply, by imposing a non-custodial sentence, the district court accorded no weight to general deterrence.

***Second***, this sentence failed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). As described in the legislative history of Section 3553(a):

> This purpose -- essentially the 'just deserts' concept -- should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

S. Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. at 3258-59.[11]

The contents of Pugh's computer contained depraved images, and there were 10 known (and countless unknown) victims in the 68 images and two videos. As the government emphasized and Pugh's own expert Warren conceded at the sentencing hearing, the pictures undeniably have a devastating impact on the young victims. In this connection, the Supreme Court has observed:

> The legislative judgment, as well as the judgment found in the relevant literature, is that the use of children as subjects of

---

[11] Notably, this notion of "just deserts" or retribution is a distinct consideration from general deterrence. See United States v. Foss, 501 F.2d 522, 527 (1st Cir. 1974) (cited with approval in the legislative history of Section 3553(a)) ("[T]he view that punishment should fit the offender has never yet been held to eliminate general deterrence as a factor to be considered along with others. . . . This is so even though general deterrence concerns itself not with the individual offender but with the sentence's impact on others.").

pornographic materials is harmful to the physiological, emotional, and mental health of the child. . . .

> It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults. Sexual molestation by adults is often involved in the production of child sexual performances. When such performances are recorded and distributed, the child's privacy interests are also invaded. . . .

The distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children. . . . [T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. . . .

> As one authority has explained:
>
> "[P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography." Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L. Rev. 535, 545 (1981). See also [Schoettle, Child Exploitation: A Study of Child Pornography, 19 J. Am. Acad. Child Psychiatry 289, 292 (1980)] ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U. Mich. J. Law Reform 295, 301 (1979) (interview with child psychiatrist) ("The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child").

33

New York v. Ferber, 458 U.S. 747, 758-59 & nn.9-10 (1982) (citations omitted);

see also United States v. Yuknavich, 419 F.3d 1302, 1310 (11th Cir. 2005)

("possession of child pornography is not a victimless crime"); Goff, 501 F.3d at

259 ("Consumers such as Goff who 'merely' or 'passively' receive or possess

child pornography directly contribute to this continuing victimization.").

Moreover, Pugh's possession -- and distribution -- of child pornography

undeniably created the demand for more. See Yuknavich, 419 F.3d at 1310 ("A

child somewhere was used to produce the images downloaded . . . , in large part,

because individuals like [the defendant] exist to download the images."). Indeed,

Pugh's own expert, Warren, also conceded that Pugh contributed to the demand for

child pornography, increasing the victimization of still more children. The

Supreme Court has explained:

> It is . . . surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand. . . . According to the State, since the time of our decision in Ferber, much of the child pornography market has been driven underground; as a result, it is now difficult, if not impossible, to solve the child pornography problem by only attacking production and distribution. Indeed, 19 States have found it necessary to proscribe the possession of this material. . . . The State's ban on possession and viewing encourages the possessors of these materials to destroy them. [In addition] . . . , encouraging the destruction of these materials is also desirable because evidence suggests that pedophiles use child pornography to seduce other children into sexual activity.

Osborne v. Ohio, 495 U.S. 103, 109-11 (1990); see also United States v. Williams, 444 F.3d 1286, 1290 (11th Cir. 2006) ("Our concern is not confined to the immediate abuse of the children depicted in these images, but is also to enlargement of the market and the universe of this deviant conduct that, in turn, results in more exploitation and abuse of children."), cert. granted, 127 S. Ct. 1874 (2007); United States v. Davis, 204 F.3d 1064, 1066 (11th Cir. 1999) (per curiam) ("We have recently explained that the harm resulting from possession of child pornography occurs when one sustains a market for such pictures.") (citing United States v. Miller, 146 F.3d 1281, 1285 (11th Cir. 1998)); Goff, 501 F.3d at 260 ("[T]he consumer of child pornography 'creates a market' for the abuse by providing an economic motive for creating and distributing the materials.").

In short, regardless of Pugh's motive, his crime was a serious one, as recognized by Congress and the courts. Congress repeatedly has stressed the terrible harm child pornography inflicts on its victims, dating back to its first enactment of child pornography laws in 1977.[12] Since that time, it has not only

---

[12] Congressional findings appear throughout the following authorities:

- The Senate Report on the Protection of Children Against Sexual Exploitation Act of 1977 recognized that: "the use of children as prostitutes or as the subjects of pornographic materials is very harmful to both the children and the society as a whole . . . [; s]uch encounters cannot help but have a deep psychological, humiliating impact on these youngsters and jeopardize the possibility of healthy,

35

affectionate relationships in the future . . . [; and] such base and sordid activities . . . may permanently traumatize and warp the minds of the children involved . . . ."  S. Rep. 95-438, at 4-9 (1977), reprinted in 1978 U.S.C.C.A.N. 40, 41-46.

• Findings in the Child Protection Act of 1984 recognized that "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the individual child and to society."  Pub. L. No. 98-292, § 2, 98 Stat. 204 (1984).

• Findings in the Child Abuse Victims' Rights Act of 1986 recognized that "Congress has recognized the physiological, psychological, and emotional harm caused by the production, distribution, and display of child pornography by strengthening laws prescribing such activity."  Pub. L. No. 99-500, § 702(2), 100 Stat. 1783 (1986).

• Findings in the Child Pornography Prevention Act of 1996 recognized that: "(1) the use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved; (2) where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years; (3) child pornography is often used as part of a method of seducing other children into sexual activity; . . . (7) the creation or distribution of child pornography which includes an image of a recognizable minor invades the child's privacy and reputational interests, since images that are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come; . . . (10)(A) the existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children; and (B) it inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials; (11)(A) the sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children by encouraging a societal perception of children as sexual objects and leading to further sexual abuse and exploitation of them; and (B) this

36

made detailed findings, but has expanded repeatedly criminal exposure for the

possession of child pornography:

1990. In Pub. L. No. 101-647, § 323, 104 Stat. 4789 (1990), codified at 18 U.S.C. § 2252(a)(4)(b), Congress proscribed the knowing possession of child pornography, adding to a statute that had made the knowing receipt of this material a crime;

1992. In Pub. L. No. 102-141, § 632, 105 Stat. 834 (1992), codified at 28 U.S.C. § 994 note, Congress directly amended the Guidelines provision addressing the offense of child pornography possession, increasing the base offense level by two levels;

1995. In Pub. L. No. 104-71, §§ 2, 3, 109 Stat. 774 (1995), codified at 28 U.S.C. § 994 note, Congress again amended the Guidelines provision, increasing the base offense level by another two levels, and adding an enhancement if a computer was used to transport or ship the material;

1996. In Pub. L. No. 104-208, § 121, 110 Stat. 3009 (1996), codified at 18 U.S.C. § 2252A(a)(5)(B), Congress added another statutory provision for possession, almost identical to the existing one, but more targeted at the problem of new computer technologies;[13]

---

sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children . . . ." Pub. L. No. 104-208, § 121, 110 Stat. 3009 (1996).

• Findings in the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 recognized that: "[c]hild pornography results from the abuse of real children by sex offenders; the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. No. 108-21, § 501(12), 117 Stat. 650 (2003).

[13] This is the offense to which Pugh pled guilty, 18 U.S.C. § 2252A(a)(5)(B).

1998. In Pub. L. No. 105-314, § 203, 112 Stat. 2974 (1998), codified at 18 U.S.C. §§ 2252(a)(4)(b) and 2252A(a)(5)(b), Congress amended the statutory provisions proscribing possession by reducing the number of images needed for conviction from three to one; and

2003. In Pub. L. No. 108-21, §§ 101, 401, 117 Stat. 650 (2003), codified at 18 U.S.C. § 3583(k) and 28 U.S.C. § 994 note, Congress increased the statutory maximum term of supervised release for child pornography possession to life, and directly amended the Guideline provision, adding an enhancement based on number of images.

In light of these detailed legislative findings and numerous legislative enactments, we cannot help but underscore the seriousness of this crime.

Although the district court recognized that child pornography is "a serious crime," the sentence it imposed did not reflect the seriousness of the crime. Nor did the sentence reflect any apparent consideration of promoting respect for the law. Even when measured through the lens of abuse-of-discretion review, these failings are conspicuous. See, e.g., United States v. Perrin, 478 F.3d 672, 676 (5th Cir. 2007) ("Though it noted the severity of the offense, the court failed to explain how this severity, particularly the images' depravity and numerosity, factored into its decision to depart downward from the guideline range to the statutory minimum.").

Indeed, even Pugh recognized the significance of his crime, proffering to the district court that "a lengthy period of home confinement" together with a "lifetime" of supervised release would "address the seriousness of the offense and

38

promote respect for the law as well provide adequate punishment." His resulting probationary sentence, on the contrary -- without any home confinement or long-term supervised release -- afforded precious little if any weight to the principles underlying 18 U.S.C. § 3553(a)(2)(A).

*Third*, the sentence imposed did not reflect consideration of "any pertinent policy statement," 18 U.S.C. § 3553(a)(5), despite the Guidelines' express policy statement for child pornography cases just like Pugh's. As early as the 2002 Guidelines Manual, the version applicable to Pugh's sentence, the relevant policy statement provided that, "[i]f the instant offense of conviction is a sex offense, the statutory maximum term of supervised release is recommended." U.S.S.G. § 5D1.2(c) (2002) (emphasis added). Concurrently, the statute itself directed that "the authorized term of supervised release for" a sex offense "involving a minor victim . . . is any term of years or life." 18 U.S.C. § 3583(k) (emphasis added), amended by Pub. L. No. 109-248, § 141(e)(2), 120 Stat. 587 (2006); see also United States v. Allison, 447 F.3d 402, 407 (5th Cir. 2006) (noting that "the policy statement recommending a life term of supervised release cannot be read in a vacuum, as the policy statement is derived from the statutory authority in 18 U.S.C. § 3583(k) and is consistent with Congress's intention to punish [sex

39

offenders] with life terms of supervised release because of the high rate of recidivism") (footnote omitted).

The legislative history in 2003 surrounding the enactment of Section 3583(k) reveals that "'Congress and the Sentencing Commission intended to impose life terms of supervised release on sex offenders. Congress explicitly recognized the high rate of recidivism in convicted sex offenders.'" Perrin, 478 F.3d at 678 (quoting Allison, 447 F.3d at 406 (citing in turn 18 U.S.C. § 3583(k); H.R. Rep. No. 108-66, reprinted in 2003 U.S.C.C.A.N. 683 (2003) (conf. report))). The Fifth Circuit has explained:

> The legislative history of § 3583(k) states that the life term of supervised release was in response to the "long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison. The current length of the authorized supervision periods is not consistent with the need presented by many of these offenders for long-term and in some cases, life-long monitoring and oversight."

Allison, 447 F.3d at 405-06 (quoting H.R. Rep. No. 108-66, at 49-50 (2003), reprinted in 2003 U.S.C.C.A.N. 683, 684; and citing United States v. Moriarty, 429 F.3d 1012, 1025 (11th Cir. 2005)). As the Fifth Circuit put it in another child pornography case, "[i]t is precisely this type of offender that supervised release was designed to rehabilitate." United States v. Armendariz, 451 F.3d 352, 362 n.6

(5th Cir. 2006) (citing S. Rep. No. 98-225, at 124 (1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 3182 ("[T]he primary goal [of supervised release] is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release.")); <u>see also</u> <u>United States v. Johnson</u>, 529 U.S. 53, 59 (2000) ("The objectives of supervised release would be unfulfilled if excess prison time were to offset and reduce terms of supervised release. Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends, distinct from those served by incarceration.") (citing S. Rep. No. 98-225, at 124 (1983)).

Yet the sentence imposed, which contains no period of supervised release, did not reflect the policy statement, the statute, or these underlying concerns.

***Fourth***, the sentence did not adequately reflect two related factors -- the "kinds of sentences available" and "the sentencing range" established by the Guidelines.  18 U.S.C. § 3553(a)(3), (4).  Nor did the district court "ensure that the justification [for the extent of its deviation from the Guidelines] [wa]s sufficiently compelling to support the degree of the variance."  <u>Gall</u>, 128 S. Ct. at 597.

Pugh's adjusted offense level was 30, and his criminal history category was level I, making his offense fall into "Zone D" of the Sentencing Table. See Sentencing Table, U.S.S.G. § 5A. Notably, the Guidelines do not authorize a sentence of probation where the applicable Guidelines range is in Zone C or D of the Sentencing Table. See U.S.S.G. §§ 5B1.1 cmt. n.2, 5C1.1(f). In addition, as we've already noted, Section 3583(k) of the statute provides that "any term of years or life" of supervised release is mandated for sex offenders like Pugh, and the Guidelines recommend a life term of supervised release. See supra at _. As a result, this probationary sentence varies both from the recommended Guidelines range, and also from the "kinds of sentences" available under the Guidelines. See 18 U.S.C. § 3553(a)(4). However, the district court did not so much as acknowledge that probation ordinarily was not available for this crime, nor that a life term of supervised release was recommended.

Furthermore, while the district court accepted the Guidelines calculation, and asked on the record whether "Mr. Pugh deserves a 97-month sentence," it did not give any real weight to the Guidelines range in imposing the sentence. Not only did the district court impose probation, which is not permitted under the now-advisory Guidelines regime, but it departed just about as much as it could -- some 97 months for an offense with a Guidelines calculation of 97-120 months'

imprisonment. The district court did not simply impose a 97-month downward variance; rather, it imposed a sentence of <u>zero</u> months' imprisonment.[14]

In the Supreme Court's parlance, the degree of variance imposed by the district court here -- far greater than the 30-month variance imposed in <u>Gall</u> -- is undeniably "major." <u>Gall</u>, 128 S. Ct. at 597. "In reviewing the reasonableness of a sentence outside the Guidelines range, appellate courts may therefore take the <u>degree</u> of variance into account and consider the extent of a deviation from the Guidelines." <u>Id</u>. at 595 (emphasis added). But the district court failed to even acknowledge that its sentence amounted to a 97-month variance, and its implicit explanation for the variance -- simply relying on Pugh's characteristics and motive -- hardly matches the degree of variance it imposed. Quite simply, in our view, the district court did not support this "major departure" with a "significant justification." <u>Id</u>. at 597. This failing is particularly telling in light of the importance the Supreme Court accorded this factor in <u>Gall</u>.[15]

---

[14] We recognize that because the statute contains no mandatory minimum, Congress understood that a judge could sentence a defendant to zero months' imprisonment. The Seventh Circuit has "imagine[d] a case, involving the downloading of a handful of images none showing any prepubescent child or depicting any sexual activity, yet still constituting child pornography (the statute defines 'child' as any minor and 'pornography' as including besides actual sexual activity 'lascivious exhibition of the genitals or pubic area,' 18 U.S.C. §§ 2256(1), (2)(A)(v)), in which a permissible sentence might be light." <u>Goldberg</u>, 491 F.3d at 672. But plainly that is not the case here. While there may be other circumstances in which a non-custodial sentence may be reasonable, this is not one of them.

[15] The Supreme Court has recently held that a district judge has the authority to deviate from the Guidelines in a particular crack cocaine case because the Guidelines range for these

43

*Fifth*, because the district court did not impose a substantial term of supervised release, the sentence did not adequately reflect the need to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The district court brushed aside consideration of this purpose of sentencing -- aimed at incapacitation -- by simply concluding that it was "convinced that I will never see you again."

As Congress has found and as we have discussed, child sex offenders have appalling rates of recidivism and their crimes are under-reported. See Allison, 447 F.3d at 405-406. Yet because the district court did not impose any custodial sentence on Pugh -- not even one day -- by law it could not impose any term of supervised release. See 18 U.S.C.A. § 3583(a) (a "defendant [may] be placed on a

---

offenses was based on "the mandatory minimum sentences set in the 1986 Act, and did not take account of 'empirical data and national experience.'" Kimbrough, 128 S. Ct. at 575 (citation omitted). The Guidelines involved in Pugh's case, however, do not exhibit the deficiencies the Supreme Court identified in Kimbrough. First, the Guidelines range is derived at least in part from the early Parole Guidelines, rather than directly derived from Congressional mandate. See, e.g., Revised Draft Sentencing Guidelines 72 (Jan. 1987) ("The serious nature of th[e] offense [of transporting, receiving, or trafficking in material involving the sexual exploitation of a minor] is reflected in the enhancement for the distribution of material depicting minors under age twelve. The amount of enhancement reflects the time specified by the parole guidelines."). Second, there is no indication that either the Guidelines range or the policy statement involved in Pugh's sentence suffers from any criticisms like those Kimbrough identified for the crack cocaine Guidelines. There, the Supreme Court found that the Sentencing Commission itself had "reported that the crack/powder disparity produces disproportionately harsh sanctions." Kimbrough, 128 S. Ct. at 575. Here, the Sentencing Commission has not made any similar statements; rather, the Guidelines and policy statement are based in part upon Congress's longstanding concern for recidivism in such cases, see supra at _, and even Pugh's expert admitted that no one, including Pugh, presents "no" risk for recidivism.

44

term of supervised release after imprisonment"); U.S.S.G. § 5D1.1; <u>United States v. Chavez</u>, 204 F.3d 1305, 1312-1313 (11th Cir. 2000). And while the district court imposed some conditions on Pugh through probation (<u>e.g.</u>, continued mental health treatment, registering as sex offender, and random visits), Pugh's compliance with those conditions will be monitored for only 5 years.[16] This period of monitoring is extremely light for a child pornography offender. Had even a short term of imprisonment been imposed by the district court, Pugh could have been monitored for a substantial period of time, including the possibility of supervised release for the rest of his life, as permitted by the statutory penalties, 18 U.S.C. § 3583(k), and recommended by the Sentencing Commission.[17]

Despite the district court's strong conviction that Pugh would not suffer from recidivism, the resulting sentence does not provide a sufficient mechanism to monitor Pugh for a lengthy time, and thus protect the public from any future crime,

---

[16] In <u>Gall</u>, the Supreme Court held that "[o]ffenders on probation are . . . subject to several standard conditions that substantially restrict their liberty." 128 S. Ct. at 595. We do not dispute this, but note that <u>Gall</u> did not involve a child pornography offense, which involves different considerations for supervised release, including the characteristics associated with child pornography offenders and the Guidelines recommendation of a life term of supervised release for such offenders.

[17] Moreover, even in cases not involving child sex offenses, supervised release is a stronger tool than probation. See <u>United States v. Reese</u>, 71 F.3d 582, 587-88 (6th Cir. 1995) ("There is an inherent difference between probation and supervised release. When probation is revoked for a violation, the rules set forth in 18 U.S.C. § 3565 limit the term of resentencing to the term allowable under the original offense. . . . By contrast, a violation of supervised release may result in a cumulative punishment that exceeds the original prison sentence.").

as contemplated in 18 U.S.C. § 3553(a)(2)(C).  This omission is particularly striking, since Pugh himself agreed to a lifetime of supervised release.[18]

*Sixth*, and finally, the sentence did not adequately reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  While the district court found Pugh to be at "the low end of the spectrum of possession," noting that the situation was "quite different from those I normally see," it nonetheless did not adequately explain how Pugh's non-custodial sentence avoided profound disparities with other similarly situated defendants.

Indeed, we have typically treated child sex offenses as serious crimes, upholding severe sentences in these cases. See, e.g., United States v. Mauldin, 224 F. App'x 915 (11th Cir. 2007) (unpublished) (affirming 78-month sentence and life term of supervised release for possession of child pornography); United States v. Hodnett, 210 F. App'x 949 (11th Cir. 2006) (unpublished) (affirming 360-month sentence and life term of supervised release for receipt, distribution, and possession

---

[18] On this note, we also disagree with Pugh's suggestion that the district court appropriately relied on his "self-motivated rehabilitation" like the district court did in Gall.  In Gall, the offender completely stopped committing the offending conduct years before his arrest; here, at best, Pugh unsuccessfully sought treatment for an adult pornography addiction prior to his arrest but nonetheless did not stop downloading child pornography.  We add that it is unclear how a related Section 3553(a) factor -- "the need . . . to provide the defendant with needed . . . medical care," 18 U.S.C. 3553(a)(2)(D) -- was furthered by the sentence the district court imposed.  Presumably Pugh could be subject to longer-term treatment had a substantial term of supervised release been imposed.

of child pornography); United States v. Thrift, 205 F. App'x 816 (11th Cir. 2006) (unpublished) (affirming 97-month sentence and life term of supervised release for use of internet to entice a minor to engage in sexual activity), cert. denied, 127 S. Ct. 2143 (2007).

We have in some instances affirmed downward variances in these kinds of cases, but in each of them, substantial prison sentences had been imposed. See, e.g., McBride, 2007 WL 4555205 (affirming 84-month sentence for distribution of child pornography where Guidelines called for 151-188 months); United States v. Bohannon, 476 F.3d 1246 (11th Cir.) (affirming 120-month sentence for use of internet to entice minor into sexual activity where Guidelines called for 135-168 months), cert. denied, 127 S. Ct. 2953 (2007); United States v. Gray, 453 F.3d 1323 (11th Cir. 2006) (per curiam) (affirming 72-month sentence for distribution of child pornography where Guidelines called for 151-188 months); United States v. Halsema, 180 F. App'x 103 (11th Cir. 2006) (unpublished) (affirming 24-month sentence for possession of child pornography where Guidelines called for 57-71 months). And in a similar case, another court upheld a substantial sentence, even though the defendant possessed many fewer images than Pugh. See United States v. Nikonova, 480 F.3d 371, 377 (5th Cir.) (affirming a 31-month sentence where the defendant possessed 13 images and the district court noted that, although the

defendant may be "atypical," her offense fell "within the heartland of cases involving possession of child pornography"), cert. denied, 128 S. Ct. 163 (2007).

In fact, Pugh has not cited and we cannot find a single case involving child pornography in which any court has upheld a non-custodial sentence like this one.[19] Rather, appellate courts have consistently overturned zero-imprisonment or other sharply downward-varying sentences in such cases on the ground that the resulting sentences were unreasonably lenient. See, e.g., United States v. Fink, 502 F.3d 585, 586 (6th Cir. 2007) (vacating sentence of 70 months' imprisonment and five years' supervised release); Goff, 501 F.3d at 262 (vacating sentencing of four months' imprisonment and three years' supervised release); Goldberg, 491 F.3d at 668 (vacating sentence of one-day imprisonment and 10 years' supervised release); United States v. Borho, 485 F.3d 904 (6th Cir. 2007) (vacating sentence of 72 months' imprisonment and 5 years' supervised release); Perrin, 478 F.3d at 672 (vacating sentence of 60 months' imprisonment and 10 years' supervised release); Armendariz, 451 F.3d at 352 (vacating sentence of five years' imprisonment and no supervised release). While these cases do not drive our decision, they do support the conclusion that the district court's probationary sentence will result in

---

[19] We have located only one case in which an appellate court has upheld a non-imprisonment sentence for a child pornography offense -- but in that unpublished decision of the Fifth Circuit, which incidentally lacks any detailed discussion, one year of house arrest was imposed. See United States v. Polito, 215 F. App'x 354 (5th Cir. 2007).

unwarranted disparities, further suggesting that the sentence imposed was unreasonable.

## IV.

Taking the Section 3553(a) factors as a whole as well as the district court's findings and calculus, we are constrained to conclude that Pugh's probationary sentence was unreasonable, and that the district court abused its discretion in imposing it. We recognize that the appropriate weight given to each of the factors cannot be calibrated with a slide rule and that the district court properly has been accorded great discretion in determining how to weigh those factors. However, the district court must give some weight to the factors in a manner that is at least loosely commensurate with their importance to the case, and in a way that "achieve[s] the purposes of sentencing stated in § 3553(a)." Martin, 455 F.3d at 1237. Where it does not, and instead "commit[s] a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case," we must remand for resentencing. McBride, 2007 WL 4555205, at *3 (internal quotation marks omitted). Indeed, if we could not say so here, we would come perilously close to holding that appellate review is limited to procedural irregularity, so long as the district court says it has reviewed all of the Section 3553(a) factors. We do not

49

read Supreme Court precedent as having so eviscerated appellate review at the same time that it has mandated the appellate courts to continue to review sentences for reasonableness.

We, therefore, VACATE Pugh's sentence, and REMAND the case to the district court for further review and resentencing. In so doing, we do not suggest what that sentence should be. We hold only that a sentence of probation, without a single day in jail or any period of supervised release is an unreasonable one.

**VACATED** and **REMANDED**.