[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14448
_____

D.C. Docket No. 1:10-cr-00310-WSD-JFK-2

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

INGER L. JENSEN,

Defendant–Appellant.

_____

No. 12-15897
_____

D.C. Docket No. 1:10-cr-00310-WSD-JFK-1

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

ANDREW S. MACKEY,

Defendant–Appellant.

_____

Appeals from the United States District Court
For the Northern District of Georgia
_____

(July 31, 2014)

Before TJOFLAT and PRYOR, Circuit Judges, and SCOLA,[*] District Judge.

PER CURIAM:

A jury found defendants Andrew Mackey and Inger Jensen guilty of conspiring to defraud investors and of committing mail and wire fraud in furtherance of a Ponzi scheme that swindled investors out of $5 million. The district court sentenced Mackey to 324 months of imprisonment and Jensen to 168 months of imprisonment. In this consolidated appeal, Mackey and Jensen raise numerous alleged errors by the district court relating to the admission of evidence, limitation on cross-examination, jury instructions, prosecutorial misconduct, sufficiency of the evidence, and the application of certain sentencing enhancements. We affirm their convictions and sentences.

I.    Background

From approximately 1995 to 2007, Mackey and Jensen operated Andrew Samuel Mackey Financial Funding Corporation (ASM), an investment company

_____

[*] Honorable Robert N. Scola, Jr., United States District Judge for the Southern District of Florida, sitting by designation.

2

that offered several investment programs, including the Wealth Enhancement Club and the Loan Warranty Program. Investors in the Wealth Enhancement Club would provide ASM a large investment, with the expectation that ASM would place the principal in foreign, high-yield investments for a promised rate of return of approximately 10% to 20% a month. Investors in the Loan Warranty Program would provide ASM with approximately 17% of their mortgage value with the expectation that ASM would invest those funds for five years and return sufficient funds to pay off the property owner's mortgage. Most of ASM's Wealth Enhancement Club investors lost their money. The government subsequently investigated ASM, which resulted in an indictment that charged Mackey and Jensen with one count of conspiracy to defraud investors, seven counts of wire fraud, and nine counts of mail fraud relating to the Wealth Enhancement Club.

At trial, the government presented testimony from investors, the intermediaries ASM used to attract investors, an attorney who had advised Mackey that the Loan Warranty Program was likely a Ponzi scheme, the Securities and Exchange Commission (SEC) attorney who investigated ASM, and a forensic accountant.

The investors who testified at trial all told similar stories: They each invested in the Wealth Enhancement Club and lost most, if not all, of their investment. Early investors received monthly payments at first, and a handful of

3

early investors did make a profit from investing with ASM.  Eventually, ASM's payments became sporadic and, at some point, investors stopped receiving payments entirely.  Some investors never received any money back from ASM and lost their entire principal.  Each investor received falsified monthly statements showing that their principal was accumulating interest and steadily growing.  One investor testified that an April 2007 statement showed that his initial investment of $100,000 had grown to over $400,000.  None of the statements ever reflected that ASM had lost money, and none reflected that any of their principal had been used for administrative costs or for commissions to intermediaries.  Some investors received 1099s and paid taxes on the earned interest reflected in those forms.

The investors testified that Mackey provided them with various excuses for why ASM was not making payments, including blaming the delay on the Patriot Act, tornados, or other natural or governmental acts in the news.  Mackey told one investor that ASM's funds were seized by J.P. Morgan Chase after a Panamanian company sent Mackey a bad check.  Mackey also told him that ASM was getting involved in a billion-dollar transaction with Cargill Hiller McCoy.  Some investors attempted to get in touch with Jensen and Mackey with little to no success.

ASM paid commissions to "intermediaries" whom ASM used to recruit investors.  Intermediaries met with investors, answered their questions, and assisted them in signing a joint venture agreement that would then be sent to ASM

4

for Mackey to sign.  Investors were also required to submit a payment at the time the investor signed the joint venture agreement.

Intermediaries attended conference calls with Mackey and Jensen.  During conference calls Jensen and Mackey falsely represented to the intermediaries that ASM was making money, and Mackey would e-mail the intermediaries about various profitable investments ASM was making on behalf of its clients.  Later, when ASM stopped making payments, Mackey said that payments were delayed because the Patriot Act required funds to go through a special governmental process to ensure the money wasn't being laundered, and that President George W. Bush's speeches contained information to people in the money industry about why the funds were delayed.  The intermediaries were also told that the Pacific Asian Atlantic Foundation (PAAF) had essentially taken over ASM and had bonds to back the Wealth Enhancement Club, but that the intermediaries were never to contact PAAF.  Mackey once told the intermediaries that ASM had $1 billion of funds or bonds with Banco de Venezuela.

The conference calls would sometimes feature guest speakers discussing different high-yield investment opportunities.  One intermediary testified that the guest speakers would always discuss investments at a very high level that she did not always understand.  She believed that Mackey did not always understand what they were saying either.  Over the course of the conference calls, it became clear to

the intermediaries that the transactions ASM hoped to use to obtain large returns were not taking place.

On one conference call Mackey mentioned that an "ungrateful client" had complained and that there was an ongoing investigation. The intermediaries were instructed not to talk to the SEC if contacted because, according to Mackey, that would hold up payments to clients. Mackey also told the intermediaries to instruct their clients to "keep quiet" and not discuss ASM with anyone other than Mackey, Jensen, or an intermediary because any investigation would slow down their receipt of profits.

The prosecution also presented evidence and testimony from Robert Townsend, an attorney who had evaluated the Loan Warranty Program. In a document Mackey reviewed before starting the Wealth Enhancement Club, Townsend noted that governmental authorities may view the Loan Warranty Program as a Ponzi scheme because it offered high returns and was relying on third-party high-yield investments to generate those returns.

The government's evidence established that over the course of approximately four years, ASM held six different bank accounts. Mackey and Jensen were signatories on all of the accounts, at least one of which was a joint account between ASM, Mackey, and Jensen. On one ASM account, Mackey is listed as ASM's president, and Jensen is listed as its vice president.

6

ASM received over $12 million from individual investors but invested only about a third of that money by sending it to other entities. ASM lost its entire principal on all but two of its investments. The records reflected that ASM paid approximately $1.1 million to intermediaries and paid approximately $5.5 million to investors.

Bank records establish over $500,000 in transfers from ASM accounts directly to Jensen and Mackey, including ATM withdrawals and over-the-counter cash withdrawals. Jensen wrote most, if not all, of the checks for ASM and she continued to write checks from ASM accounts to herself and Mackey after payments to ASM investors stopped. Monies from ASM bank accounts were also used to pay for credit cards held by Jensen and Mackey individually.

There were significant disparities between the balances reflected in ASM's bank records and what Mackey and Jensen were telling the investors about those balances. In April 2006, ASM told its investors that it had over $6 million in its accounts, when its actual balance was just over $100,000 at the time. In October 2006, ASM told its investors that it had over $14 million in its accounts, when its balance was then approximately $150,000. Similarly, in April 2007, ASM told its investors that it had almost $50 million in the bank, but its balance was less than $300,000. In one e-mail, Jensen indicated that ASM had opened a bank account in Panama and that she had personally confirmed that the account contained a $330

million balance by calling the bank.  There was no evidence that ASM ever had $330 million in a bank account.

Mackey testified extensively on his own behalf and denied defrauding any investors.  He testified that the contracts signed by investors called for ASM to work on a "best efforts" basis and that the hope of high-yield investments did not come without risk.  Mackey claimed that the investors' monies were lost because ASM was defrauded by the entities in which it placed the funds for investment and that he was as much of a victim as the investors.

After an eight-day trial, the jury returned guilty verdicts on fifteen of the seventeen counts of the indictment.

II.    Challenges to evidentiary rulings

Mackey and Jensen challenge several of the district court's evidentiary rulings.  We are persuaded by none of their arguments.  We review the district court's evidentiary rulings for an abuse of discretion and will reverse "only if the resulting error affected the defendant's substantial rights." *United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003).  We determine whether error was harmless "by weighing the record as a whole . . . examining the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of [the] defendant's guilt." *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999) (internal quotation marks and citation omitted).

8

### a. Admission of the summary charts into evidence

Mackey and Jensen contend that the district court erred in admitting the government's summary charts because the summaries were inaccurate and did not fairly represent the evidence presented to the jury.  Before admitting this evidence, the district court asked whether there was any objection.  Mackey and Jensen replied that they had no objection.  In fact, Mackey stated that he affirmatively stipulated to their admission.  After identifying the exhibit numbers, the district court again asked whether there was any objection to their admission.  Mackey and Jensen confirmed that they had no objection.  Mackey and Jensen invited any error the district court may have made in this regard, and we are precluded from reviewing this argument on appeal.  *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009) ("Where a party invites error, the Court is precluded from reviewing that error on appeal." (internal quotation marks omitted)); *United States v. Ross*, 131 F.3d 970, 988 (11th Cir. 1997) ("It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." (internal quotation marks omitted)).

### b. Admission of evidence related to the Loan Warranty Program

Mackey also claims that the district court erred in admitting evidence relating to the Loan Warranty Program, a program not charged in the indictment,

9

and allowing that evidence to dominate the government's presentation. We disagree.

In admitting this evidence, the district court found that some evidence relating to the Loan Warranty Program was necessary to understand the context, motive, and setup of the Wealth Enhancement Club. Evidence introduced at trial established that some investors participated in both the Loan Warranty Program and the Wealth Enhancement Club, and that capital invested in both programs was commingled in ASM's bank accounts. There was at least some evidence that capital invested into the Loan Warranty Program was used to pay returns to investors in the Wealth Enhancement Club. Moreover, the district court instructed the jury that it could consider evidence relating to the Loan Warranty Program only for the limited purpose of evaluating Mackey's intent. The court did not abuse its discretion in admitting evidence relating to the Loan Warranty Program.

Even if the district court erred in admitting this evidence, any error was harmless since there was overwhelming evidence relating directly to the Wealth Enhancement Club to establish Mackey's intent. *See United States v. Gamory*, 635 F.3d 480, 494-95 (11th Cir. 2011). Trial testimony established that the Wealth Enhancement Club was never profitable, and early investors were paid "returns" from capital invested by other investors. One witness testified that Mackey represented to the intermediaries that ASM was profitable and was involved in

10

large-scale international deals.  ASM continued to send Wealth Enhancement Club investors account statements showing steadily increasing principals even after ASM had lost or spent much of that capital.  There was evidence that Mackey relayed various excuses for non-payment to its intermediaries and instructed intermediaries to inform Wealth Enhancement Club investors not to report ASM to any governmental authorities.  There was also evidence that Mackey ignored Wealth Enhancement Club investors' withdrawal requests and requests for information and that Mackey initially sought to evade the FBI's investigation into ASM.  In light of this evidence and our independent review of the record, we do not agree that evidence relating to the Loan Warranty Program dominated the government's presentation.  Further, there is not a reasonable likelihood that its admission affected the jury's verdict.

### c.  Admission of the Townsend memorandum

At trial, the government introduced a document created by attorney Robert Townsend in which Townsend opined on the legality of the Loan Warranty Program.  Mackey and Jensen contend that the memorandum was protected by the attorney-client privilege and should not have been admitted against Mackey.  Even if admissible, they challenge its relevancy and argue that it was so prejudicial that the court should have excluded it under Rule 403 of the Federal Rules of Evidence.  They also contend that the government improperly used the evidence to establish

11

the ultimate issue and that it was improper for the district court to allow the memorandum to be presented to the jury through Townsend's live testimony.

We need not determine whether the Townsend memorandum was protected by the attorney-client privilege because, even if it was, Mackey waived the privilege. Mackey's counsel asserted a good-faith advice of counsel defense in his opening statement:

> And most of these deals, if not all of them, had one thing in common, and that is that they all either had a lawyer or a Ph.D. who was involved in the transaction and who was, you know, explaining to Mr. Mackey how this was fine and how this was going to work.

By claiming that Mackey lacked intent to defraud because attorneys told him that Wealth Enhancement Club transactions were legal, Mackey waived the attorney-client privilege with respect to communications with counsel concerning its legality. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1417, 1419 (11th Cir. 1994); *United States v. Bilzerian*, 926 F.2d 1285, 1292-93 (2d Cir. 1991), *cert. denied*, 502 U.S. 813, 112 S. Ct. 63, 116 L.Ed.2d 39 (1991).

Because the Townsend memorandum evaluated only the legality of the Loan Warranty Program, Mackey and Jensen contend that it was not relevant to the Wealth Enhancement Club. We disagree. The Townsend memorandum warned that the high-yield investments ASM was investing in and relying on to generate returns for the Loan Warranty Program were probably Ponzi schemes. It also warned that law enforcement entities would likely view the Loan Warranty

12

Program itself as a Ponzi scheme because ASM was offering extremely high rates of return and was relying on high-yield investments as the basis for generating those returns. The Wealth Enhancement Club's business model was similar—it offered extremely high rates of return and, in part, relied on high-yield investments as the basis for generating returns. Because Mackey used this business model for the Wealth Enhancement Club after receiving and reviewing the Townsend memorandum, the district court was well within its discretion to find that it was relevant to Mackey's intent regarding the Wealth Enhancement Club.

We also cannot say that the district court abused its discretion in determining that the danger of unfair prejudice did not substantially outweigh the probative value of the Townsend memorandum. In criminal trials, relevant evidence is inherently prejudicial, so a district court may exclude relevant evidence "only when unfair prejudice substantially outweighs probative value." *United States v. Merrill*, 513 F.3d 1293, 1301 (11th Cir. 2008) (quoting *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir. 1984)). "When reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Brown*, 441 F.3d 1330, 1362 (11th Cir. 2006). Mackey's intent was the lynchpin of his defense, and this evidence was highly probative of that intent. The district court admitted it only against Mackey and for the limited

13

purpose of determining his intent. The court provided a limiting instruction during Townsend's testimony and on two other occasions during trial. Irrelevant portions of the Townsend memorandum were redacted. Moreover, the court's repeated instruction to the jury that the Townsend memorandum could not be considered against Jensen mitigated any potential "spillover effect" from the admission of this evidence. *United States v. Kennard*, 472 F.3d 851, 859 (11th Cir. 2006). Accordingly, we affirm the district court's decision to admit the Townsend memo. *United States v. Smith*, 459 F.3d 1276, 1296 (11th Cir. 2006).

Finally, viewing the record as a whole, we cannot say that allowing Townsend to testify or the manner in which the government used the Townsend memorandum warrants a new trial. Other than a few background questions, Townsend's testimony was limited to reading portions of the document admitted into evidence. And, in the context of the entire trial, the government did not improperly use this piece of evidence. Although the Townsend memorandum advised that law enforcement officials would likely view the Loan Warranty Program as a Ponzi scheme, it did not opine on the legality of the Wealth Enhancement Club. Nor did the memorandum directly opine on Mackey's and Jensen's guilt or innocence. The government's questions to Mackey on his decision to invest Wealth Enhancement Club capital in third-party high-yield investment programs after reviewing Townsend's advice were appropriate and

14

relevant to Mackey's intent.  In addition, the district court properly instructed the jury regarding consideration of this evidence.  We presume the jury followed the court's instructions.  *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir. 2005).

### d.  Limits on cross-examination regarding the joint venture agreement

Mackey and Jensen argue that the district court erred by not allowing them to cross-examine the investors on their understanding of the risk-disclosure and best efforts provisions in the joint venture agreements.  They claim that the limitation violated their Sixth Amendment right to confront witnesses against them and that it resulted in the exclusion of crucial evidence necessary to establish a valid defense.  We are not persuaded by either argument.

To show a violation of the Confrontation Clause of the Sixth Amendment, a defendant must "demonstrate that he was prohibited from engaging in otherwise appropriate cross-examination designed to show bias on the part of the witness, and thereby expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses." *United States v. Orisnord*, 483 F.3d 1169, 1178 (11th Cir. 2007) (internal quotation marks omitted).  "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *United States v.*

15

*Garcia*, 13 F.3d 1464, 1469 (11th Cir. 1994).  We review preserved claims of

constitutional error *de novo*.[1]  *United States v. Brown*, 364 F.3d 1266, 1268 (11th

Cir. 2004).

Mackey's counsel extensively reviewed every risk-disclosure and best-

efforts provision in the joint venture agreements with each investor.  The investors

were cross-examined regarding whether they had any interactions with Mackey

and Jensen before signing the agreement; they each testified that they spoke only to

the intermediary and, in some cases, other ASM investors and that neither Mackey

nor Jensen made any direct representations to them about the Wealth Enhancement

Club or the agreement.  On this record, we cannot say that the jury would have had

a significantly different impression of the investors' credibility had defense

counsel questioned the investors on their understanding of the best-efforts and risk-

disclosure provisions.

The district court does not have discretion to exclude crucial, relevant

evidence that is necessary to establish a valid defense.  *United States v. Todd*, 108

F.3d 1329, 1332 (11th Cir. 1997).  Here, however, questions regarding the

investors' subjective understanding of the risk-disclosure and best-efforts

provisions were not crucial or necessary for Mackey and Jensen to establish a valid

---

[1] Jensen did not make a timely Confrontation Clause objection, so review of her challenge is subject to plain error review.  *United States v. Arbolaez*, 450 F.3d 1283, 1291 (11th Cir. 2006). However, because Mackey's challenge fails under *de novo* review, Jensen's challenge also fails.

16

defense—the focus of these criminal charges was whether Mackey and Jensen intended to defraud ASM's investors, not on whether the investors believed they were getting involved in a legitimate but risky investment. *See United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) ("[T]he focus of the mail fraud statute, like any criminal statute, is on the violator . . . .").

Regardless of the excluded line of questioning, Mackey and Jensen were able to present evidence of their good faith defense. Mackey testified about his understanding of the provisions in the joint venture agreement, including the risk-disclosure and best-efforts provisions. He testified that he made the risk known to "his" people and that he would not sign a contract that guaranteed a specific high rate of return. Mackey and Jensen's counsel were also free to explore whether Mackey or Jensen directly made any representations about ASM or the Wealth Enhancement Club to each investor before the investor executed the joint venture agreement. As a result, we conclude that Mackey and Jensen's right to a fair trial was not violated and that they were not prevented from presenting their defenses.

III.    Sufficiency of the evidence to support Jensen's convictions

Jensen challenges the sufficiency of the evidence to support her convictions on two grounds. First, she argues that the government's evidence at most established that Mackey had poor business acumen. Second, she argues that there was insufficient evidence to demonstrate that she had the requisite knowledge.

17

We review the sufficiency of evidence to support Jensen's conviction *de novo*, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007). A jury's verdict "cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013).

In the light most favorable to the government, the evidence establishes that ASM was operating as a Ponzi scheme. The government presented evidence that the Wealth Enhancement Club was never profitable and that ASM paid returns to its investors from new capital paid to ASM by later investors. It also presented evidence that ASM invested only a small portion of capital it received from Wealth Enhancement Club investors and lost almost all of the capital it did invest.

Instead of admitting that ASM had lost investors' capital, there was evidence that Jensen knowingly assisted in the fraud. For example, Jensen was listed as the vice president of the company on ASM's website, and there was testimony that she held herself out as second-in-command on conference calls. Mackey testified that Jensen knew about ASM's failed investments and was actively involved in attempting to recover ASM's investments from the fraudulent companies it invested in. There was evidence that Jensen provided excuses to intermediaries

18

and investors about why ASM was not paying investors returns, including evidence that she had provided false information about ASM's assets. For example, she reported that ASM held over $300 million in a Panamanian bank account when it, in fact, did not.

Jensen exercised control over ASM's various bank accounts. She drafted most of ASM's checks, including checks written to herself, to Mackey, and even for her daughter's entry fee into a beauty contest. Jensen wrote checks to ASM's investors and sent investors false account statements showing that their principal was steadily increasing. She also sent false 1099 forms to investors reporting that investors had earned interest on their initial investment. Jensen communicated with the intermediaries regarding ASM's ability to pay and its excuses for non-payment. For example, Jensen reported that ASM had a bank account in Panama with a $330 million balance, even though the evidence established that ASM never held this large a balance in any bank account.

To be sure, the defense presented contrary evidence. But in light of the government's evidence, the jury was free to disregard Jensen's theory that ASM was a legitimate business that failed simply because Mackey made poor investment decisions. The jury was also free to conclude that the Wealth Enhancement Club started as a legitimate investment club but that Mackey and Jensen converted it to a Ponzi scheme in order to cover losses. Construed in the light most favorable to the

19

jury's verdict, the evidence was also sufficient to show that Jensen had the requisite knowledge.  We conclude that the evidence presented at trial was more than sufficient to support Jensen's convictions.

IV.    Challenges to jury instructions

At the end of trial, Mackey and Jensen asked the district court to give a theory of the defense instruction.  The district court denied the request.  Over Jensen's objection, the district court also elected to give a deliberate ignorance instruction only as to Jensen on the conspiracy count.  Mackey and Jensen argue that each error requires a new trial; we disagree.

a.  Refusal to give "theory of the defense" instruction

We review the district court's refusal to give a proposed jury instruction for abuse of discretion.  *United States v. McQueen*, 727 F.3d 1144, 1154 (11th Cir. 2013).  A district court abuses its discretion in denying a request to give a theory of the defense instruction for which there was a sufficient evidentiary basis only if: "(1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense."  *United States v. King*, 751 F.3d 1268, 1275 (11th Cir. 2014) (quoting *United States v. Palma*, 511 F.3d 1311, 1315 (11th Cir. 2008)).

A majority of the proposed theory of the defense instruction was

20

substantially covered by the actual instruction given, and the actual instruction adequately informed the jury regarding the good faith analysis. The district court's instruction was more than sufficient to assist the jury in evaluating whether the government proved that Mackey and Jensen had the requisite intent to defraud.

The only portion of the proposed theory of the defense instruction not included in the actual instruction was a list of some of the evidence elicited at trial that indicated a lack of intent. The district court did not abuse its discretion in refusing to emphasize evidence favorable to the defendants when instructing the jury. *United States v. Maxwell*, 579 F.3d 1282, 1304 (11th Cir. 2009); *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007). Defense counsel was free to—and did—discuss the import of these pieces of evidence during closing. Argumentative statements regarding the application of evidence to the law are appropriate in closings, not jury instructions.

### b. Deliberate ignorance instruction

A district court should only instruct a jury on deliberate ignorance "when the facts support[] the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Schlei*, 122 F.3d 944, 973 (11th Cir. 1997) (quoting *United States v. Perez-Tosta*, 36 F.3d 1552, 1564 (11th Cir. 1994)) (alteration omitted). Any

21

error in giving a deliberate ignorance instruction is harmless where: (1) the jury was clearly instructed that a precondition to its application of the deliberate ignorance instruction was proof beyond a reasonable doubt that the defendant deliberately kept herself ignorant, and (2) the evidence was sufficient, but not necessarily overwhelming, to support a conviction based on actual knowledge. *United States v. Stone*, 9 F.3d 934, 937-39 (11th Cir. 1993).

We do not need to decide whether the evidence supported a deliberate ignorance instruction because, even if the instruction was erroneous, any error was harmless. The district court instructed the jury on actual knowledge, and the overwhelming evidence supported the jury's finding that Jensen had actual knowledge of the unlawful nature of ASM's business. So, even if the deliberate ignorance instruction was erroneous, reversal is not warranted.

V.    Sentencing issues

Mackey and Jensen argue that their sentences were improperly enhanced for the loss amount, number of victims, the use of sophisticated means, and investment advisor enhancement. Mackey also argues that the district court erred in applying an "organizer or leader" enhancement, and Jensen argues that it erred in denying her a minor role reduction. We review the district court's factual findings for clear error and its application of the Sentencing Guidelines *de novo*. *United States v. Newman*, 614 F.3d 1232, 1235 (11th Cir. 2010). The district court is required "to

22

make independent findings establishing the factual basis for its Guidelines calculations." *United States v. Hamaker*, 455 F.3d 1316, 1338 (11th Cir. 2006). It may base these findings on, among other things, "evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." *United States v. Ndiaye*, 434 F.3d 1270, 1300 (11th Cir. 2006).

### a. *Loss amount enhancement*

Mackey and Jensen contend that the district court erred by applying an 18-level enhancement for causing a loss between $2.5 million and $7 million. The PSI recommended a 20-level enhancement for a loss of over $7 million. While Mackey objected that there was insufficient evidence to support a finding of any loss, Jensen objected on more limited grounds: Jensen argued that an 18-level enhancement should apply because the loss was between $2.5 million and $7 million. The Court sustained the objection. *See United States v. Weeks*, 711 F.3d 1255, 1261 (11th Cir. 2013) (noting that we review arguments not raised in the district court for plain error). Regardless, their argument fails.

In fraud cases, the Sentencing Guidelines provide for an 18-level enhancement where the offense results in a loss between $2.5 million and $7 million. U.S.S.G. § 2B1.1(b)(1)(J), (K) (Nov. 2012). For sentencing purposes, "the loss amount does not need to be precise and may only be a reasonable estimate of the loss based on available information." *United States v. Woodard*,

23

459 F.3d 1078, 1087 (11th Cir. 2006).

The record establishes that the district court rejected the $7.8 million loss calculation provided in the presentence investigation report (PSI) and, based on evidence and testimony introduced at trial and presented at the sentencing hearing, determined that the loss from Wealth Enhancement Club was approximately $5.5 million.  Because the loss amount was supported by reliable and specific evidence, the district court did not err in applying this enhancement.

  *b.  Multiple victims enhancement*

Mackey and Jensen also argue that the district court erred by applying a 4-level enhancement for committing an offense involving 50 or more victims, under U.S.S.G. § 2B1.1(b)(2)(B).  Again, the argument fails.

Jensen did not object to the assertion in the PSI that the offense involved more than 50 victims.  That fact was, therefore, admitted against her for sentencing purposes.  *See United States v. Bennett*, 472 F.3d 825, 833-34 (11th Cir. 2006) (stating that the failure to object to facts found in a PSI renders those facts admitted for sentencing purposes).  Moreover, the evidence and testimony from trial and the sentencing hearing supported the district court's finding that the offense involved more than 50 victims.  The district court did not err in applying a 4-level enhancement for committing an offense involving 50 or more victims.

  *c.  Sophisticated means enhancement*

24

Mackey and Jensen next argue that the district court erred when it applied a 2-level enhancement based on their use of sophisticated means to perpetrate their fraud or to avoid detection. U.S.S.G. § 2B1.1(b)(10)(C). "Sophisticated means" is defined as "especially complex or especially intricate offense conduct" that pertains to executing or concealing the offence. *Id.* § 2B1.1(b), cmt. n.8(B). A defendant's individual actions need not be sophisticated, provided that the totality of the scheme was sophisticated. *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010).

The district court found that Mackey and Jensen created documents to lull investors into believing that they were investing in a legitimate securities transaction; sent false account statements to investors; issued false 1099 forms to investors; and made statements to investors to avoid detection and to convince them that they would lose their investment if they contacted law enforcement. The totality of these activities carried out over an extended period of time is sufficient to support the district court's finding that Mackey and Jensen used sophisticated means to obtain investors and conceal their fraud. The district court did not clearly err in applying a 2-level sophisticated means enhancement.

### d. Investment advisor enhancement

The sentencing guidelines provide for a 4-level enhancement if the offense involved "a violation of securities law, and at the time of the offense, the defendant

25

was . . . (iii) an investment advisor, or a person associated with an investment advisor." U.S.S.G. § 2B1.1(b)(18)(A). To apply the investment advisor enhancement, the defendant need not be convicted under a securities or commodities law. *Id.* § 2B1.1(b) cmt. n.14(B). Rather, it may apply when a defendant is convicted under a general fraud statute if the defendant's conduct violated a securities law or commodities law. *Id.* For purposes of this enhancement, the term "investment adviser" carries the same meaning as in the Investment Advisers Act of 1940: "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ." *Id.* § 2B1.1(b) cmt. n.14(A); 15 U.S.C. § 80b-2(a)(11).

Mackey and Jensen's conduct satisfies the elements of 15 U.S.C. § 77(g)(a) and constitutes a violation of securities laws. Because Mackey exercised control over how (and whether) the Wealth Enhancement Club investors' funds were invested, Mackey is considered to have provided investment advice for purposes of the Investment Advisers Act of 1940 and the investment advisor enhancement. *United States v. Elliott*, 62 F.3d 1304, 1310 (11th Cir. 1996) (finding that defendants provided investment advice by controlling which investment vehicles their customers invested in); *see also Abrahamson v. Fleschner*, 568 F.2d 862, 871 (2d Cir. 1977) ("[M]any investment advisers 'advise' their customers by exercising

26

control over what purchases and sales are made with their clients' funds.").

Jensen, as the vice president of ASM, exercised control over investors' funds, and acted in more than just a ministerial capacity. The district court did not clearly err in applying this 4-level enhancement.

### e. The "organizer or leader" enhancement

A district court can impose a 4-level enhancement to a defendant's sentence "if the defendant was an organizer or leader of criminal activity that involved five or more participants o*r was otherwise extensive*." U.S.S.G. § 3B1.1(a) (emphasis added). There is more than sufficient support in the record for the district court's finding that Mackey's criminal activity was "otherwise extensive." The district court did not clearly err in applying this enhancement.

### f. Minor role reduction

Jensen argues that she was merely a clerical worker and that the district court clearly erred when it denied her a minor role reduction, but we disagree.

A district court can reduce a defendant's offense level by 2 levels if the defendant was "a minor participant" in the crime. U.S.S.G. § 3B1.2(b). To determine whether Jensen was entitled to a reduction for a minor role, the district court had to consider (1) her "role in the relevant conduct for which she has been held accountable at sentencing," and (2) "her role as compared to that of other participants in her relevant conduct." *United States v. De Varon*, 175 F.3d 930,

27

940 (11th Cir. 1999). "The fact that a defendant's role may be less than that of other participants engaged in the relevant conduct may not be dispositive of role in the offense, since it is possible that none are minor or minimal participants." *Id.* at 944. The defendant must prove that a mitigating-role adjustment is merited by a preponderance of the evidence. *Id.* at 939.

The record amply supports the district court's finding that Jensen did not play a minor role. Jensen had independent control over ASM's bank accounts, wrote checks to investors as well as to herself and Mackey, and communicated false information about ASM's accounts to investors. Based on this evidence, the district court was entitled to find that Jensen performed an important role in conducting the Wealth Enhancement Program, and that, while her role was different from Mackey, she was not substantially less culpable than Mackey. The district court did not clearly err in declining to apply a minor role adjustment.

VI.    Conclusion

Based on the foregoing, we affirm Mackey and Jensen's convictions and sentences.

AFFIRMED.

28